Good morning, Your Honor. I'm Andrew Roth. I represent the appellants in this matter, Dehertoghe. The position that we're taking here before the Court is that this Court, on the record before it, should be guided by a previous decision of the Ninth Circuit in Hopkins v. Zendaya, and we think that the record is sufficiently close that that's really the only issue that has to be carefully addressed. The reason we take that position is that we believe that the record itself has sufficient evidence, similar to the evidence in Hopkins, that disputes the claims that Officer Gigande makes regarding the nature of the peril that he was in, which he uses for a justification for the use of deadly force. Hopkins v. Zendaya, we would argue, continues to be the law on the Ninth Circuit, and there's recent case law supporting that. And finally, as a policy matter, we would take the position that the Court should not depart from the precedence that we have in the Ninth Circuit with respect to the use of deadly force, particularly in cases where the victim of the shooting is not armed, and there's clear precedent there. Addressing first the record, if I may, the central evidentiary dispute here is the precise nature of the assault that Officer Gigande claims he had to defend himself against. And there is, in the record, substantial evidence offered by the defense in this case, mainly through the depositions or the declarations of Officer Gigande and Officer Wieman, describing a very prolonged, very violent, a very brutal and relentless attack, not just by Mr. Deherdeje, but there's a claim that Mr. Belton also was involved in that attack. It wasn't just a brief encounter. There is, however, in the record, evidence that was offered by the plaintiff in our opposition, our first opposition to the motion for summary judgment, that Officer Gigande did not find himself in the position described by the defense here. That, in fact – Would you keep your voice up, counsel? Yes, Your Honor. Thank you. But, in fact, he did not find himself in the position of the kind of peril that he describes, but there is evidence that at the time he shot Mr. Deherdeje, he had only been struck from behind. He was not down, that he was standing, that he was not subjected to the continual and relentless attack that's described by the defense here. Now, in Hopkins v. Andaya, as in this case, there was evidence offered by the defense that the officer described a brutal attack. And, in fact, part of the attack in Hopkins was found to be quite brutal. However, the only evidence in Hopkins that was considered by the court of appeal in opposition to that was the evidence of the medical reports. And that was discussed at length by the court in Hopkins. And the court found that the disparities were sufficient to establish a potentially milder version – I think that's the language used in Hopkins – a milder version of the assault that Officer Andaya was suffering at the hands of, I think it was Mr. Stanzel, the person who got shot. The Hopkins court indicated that while factual conflicts concerning the true nature of the threat confronting the officer might be resolved in the officer's favor at trial, it's neither our job, neither the court of appeals' job, nor the job of the district court to resolve those conflicts in the evidence on a motion for summary judgment. And as an aside, Hopkins went back to the trial court and was tried, and the officer – the officer was found guilty of dijousing a witness from behind. Is that right? That's correct. That's correct. The evidence I think that the court should be looking at to determine whether there's sufficient evidence to raise a substantial or a genuine justification for the conviction, that there is sufficient evidence to do that. And I think that's a very important point, because I think it's a very important point to make when Mr. Belton says he wasn't involved in the attack on Giogondi at all after Giogondi was knocked off by Deherdejais. And more importantly, I think even if there was only the medical reports that are submitted here, I think that we would be on all fours with Hopkins versus Zendaya. But we have more. We have more than the court had on Hopkins. Now, who testified that he was not knocked down? Witness Ron Goodeagle was deposed by the defense in this case and was asked twice whether at the time the officer fired, was he standing or was he down? And twice answered he was standing. Now, where was he in respect to the altercation? What was his point of vantage? He was, I don't recall whether the evidence that was offered established exactly where he was, but my recollection was that he was on the same level. This was in a motel out in Hemet, and he was on the same level looking perhaps 50 feet away at what was going on. I might be mistaken about that, but there was no obstruction indicated to his view. Importantly, he testified that within a couple of seconds, that was the witness's own statement, within a couple of seconds of Mr. Deherdejais striking the officer, the shots were fired. And that becomes very important because that's inconsistent with the officer's version, with both officers' versions. Well, if you assume all of the facts in light most favorable to your side, that is that he was seen standing just after the shots were fired, the shot was fired. At the time the shots were fired, yes, Your Honor. Well, all right. But what difference does that make? Because there is no dispute at all that there wasn't assault, that he had at least a mild concussion, and that the two officers were losing the battle. And I think that at this point, my answer to that would be that for the Court to adopt a rule justifying the use of deadly force as a matter of law under those facts, the Court would be taking a step that the Ninth Circuit hasn't taken before. Not really. It is just slightly factually different, naturally, from Billington, but not very. I would disagree with Your Honor. No, you disagree because you say there it was clear that the assailant was trying to get the officer's gun. I think that I would answer that by the recent ñ by citing to the Court the recent Ninth Circuit decision in Hagen v. Brosseau, which was decided about three months ago. The officer there, Officer Brosseau, testified that when ñ I mean, there was no objective basis for that officer to believe that she was in any jeopardy. I mean, the guy was in his car and heading south. She reacted in order to, according to what she said, protect other people from a potential high-speed chase. Here you have an officer engaged in hand-to-hand combat that he's losing. He's armed, and if he does lose, his weapon is free game to people who are obviously drunk and out of control. That is precisely ñ I think the Court has addressed precisely the policy issue that we should be considering here, if at all. That is, in almost every confrontation with a police officer, the police officer brings a gun, whether it's a traffic stop or an investigation or an arrest of a murder suspect, the police officer brings a gun. And under circumstances where the police officer gets involved in any kind of hand-to-hand combat or battle or threat from one or more persons, the police officer can, in his mind, be concerned that if he loses, if he loses, the person might go for the gun.  MS. GOTTLIEB Is that a requisite, though? Is there no situation, in your view, in which deadly force can be used in response to an attack with a gun?  GOTTLIEB No. I think that, answering with respect to the record that we have here, there really is sort of an ambiguity about the defense's position as to the justification for deadly force. On the one hand, it appears that the officer ñ MS. GOTTLIEB That's not responsive to my question. I need you to go back. And you were talking about the cases involving the possibility that someone might go for the officer's gun. And my question to you is, even if we assume that no one is going for the gun, can deadly force be used in response to an attack with fists or without extra weapons being involved? GOTTLIEB I think the answer would be, under the right circumstances, yes, that the courts would find and a jury would find that a police officer would have qualified immunity to use deadly force in an attack by fists, a very, very brutal attack where it was unreasonable, where it was not unreasonable for the officer to respond that way. And that's why the dispute about the nature of the facts in this case, I think, becomes important. And also, if you look at Hopkins v. Andaya, you know, the Ninth Circuit had no problem with Officer Andaya using deadly force against Mr. Stancil at the point at which he was being struck with his own baton. There was no dispute that he was under some kind of an attack, although there was a dispute about how deadly it was. The Court didn't have a problem with his qualified immunity there. It was the second application of deadly force where the Court in Hopkins talked about the Graham analysis of the need for deadly force, the other options that were available to the officer. And the Court indicated it was reluctant to endorse, I think that's the language, reluctant to endorse the use of deadly force for an officer in a position where he has alternatives and there's really no demonstrated need for the use of deadly force. I'm not aware, I may have missed a case, but I'm not aware of any case where the Court or an appellate court found that as a matter of law, a police officer who was losing a fistfight was entitled to use deadly force to prevent himself from being injured in a fistfight. I do believe that's an appropriate issue to be raised to a jury. And I think in this case that that will be raised to the jury if we get back to the trial court. The concerns that we should have is to adopt a rule that would fit the defense position here. I think we would have to adopt a rule that a police officer who brings a gun to every confrontation and is lawfully supposed to bring a gun to every confrontation can make in his own mind a decision that it's an unacceptable risk that the subject will not only win the fight, but after winning the fight take the gun. Yes, but that's not the inquiry. It's an objective one. I'm sorry, Your Honor? That's not the inquiry. We're not getting inside this officer's mind. Precisely. Precisely. The declaration that was submitted in support of the motion for summary judgment, the declaration of Officer Gigande, doesn't claim, he does not claim that he used deadly force to defend himself from the attack. No. The issue is whether it would be objectively reasonable for an officer situated as he was to conclude that he was in deep trouble. I think that the question is, if you look at it in terms of Saussure, Saussure v. Katz, is there clearly established law teaching this officer that he's not entitled to do this? Well, of course, the first question in Saussure is one that you don't deal with in your brief at all. Because we don't just jump to the qualified immunity issue, and you don't brief the issue of whether there's a straight-up constitutional violation. I don't know what to infer from that, whether you concede that there wasn't. I certainly do not concede that there was not a straight-up constitutional violation. Well, it's not. Under the cases that we cited, Hopkins in particular, the use of deadly force against an unarmed man is established as a constitutional violation. I think the question that we have to answer after Saussure, which was decided after Judge Reel granted summary judgment motion here, the question we now have to answer is, given that the fair warning is given to police officers that they're not to use deadly force under those kinds of circumstances, given that, how clear, how clearly established is the law? I would suggest to the Court that moving the bright line that currently exists created by Hopkins and even Billington, Billington helps us with that line. Moving the bright line to a situation where there is no evidence of a statement or an intent or an attempt to take the gun, to arm himself, absolutely no evidence of this record, is improperly obscures the line that police officers should have with respect to. Well, that actually seems to contradict what you said to me a moment ago. That's why I asked the question that I asked. I said, leaving aside the possibility of grabbing for the weapon, can an attack by fists and feet alone support deadly force? And you said, yes, it can. So now you're saying, no, there has to be a bright line that if the person's not going for the gun, then all bets are off. So what is the rule that you want us to adopt? There is already a bright line with respect to officers' concerns about the guns being taken away and used against them. Okay. And that's Hopkins versus Zendaya and Billington. Okay. But you said earlier that you weren't going to say that that's the absolute place to draw the line. It is not. I would agree that it is not necessary for an officer to be threatened with a gun in order to be justified in using deadly force. And I would also agree that there can be circumstances under which a physical attack with fists, feet, elbows could be sufficient to place an officer in a position where, using the Graham standards, it would not be unreasonable for him to decide to defend himself with deadly force. The record in this case, however, has dispute about that issue. And I think that's the problem here. The record, when viewed most favorable to the appellant here, is that there was a blow from behind. Officer Gigande was knocked off of Mr. Belton. And within a couple of seconds, he turned, standing, and shot Mr. Deherdige. Now, whether we can prevail on those facts at trial is another question. But I don't think that it's the burden of the appellant to prove the exact position of the officers, whether it was two seconds or three or four seconds, as was later testified to, however long it was. The burden, I believe, for the appellant, the opponent of summary judgment, was very well discussed in Hopkins v. Zendaya, where they indicated that the jury, because the jury could reasonably find, based on just the medical evidence in Hopkins, that there was a much milder version than the officer was not in the kind of peril he described. The plaintiff has met the burden of getting past summary judgment. Mr. Roth, would you like to save some significant time for rebuttal? Yes, I would, Your Honor. Okay. If there's some questions at this point, I'd like to save time.  Ms. Pfeffer. Yes, good morning. May it please the Court, my name is Elizabeth Pfeffer, and I represent the appellees, City of Hemet, and three named police officers. The appellants have been arguing that if you view the evidence most favorably to them, that there's a triable issue of fact, and summary judgment should be reversed. I submit to you that the appellants really don't offer a version of the fact. It's in the brief, and we've just heard an oral argument that, well, Dana Deherjee attacked Officer Gigante, and a few seconds later he was shot, but we're leaving out the crucial few seconds. It's a domestic violence call. The officer separated Dana Deherjee, who was sitting against the wall in the motel room, from his wife. And while they're trying to determine what's going on, Belton appeared in the door frame, and he was concealing his body, and Officer Gigante couldn't see what was going on. We know up to that point that there had been a lot of alcohol consumed that night by everybody, and that's in the record, and that's undisputed. Belton admits, I could have had a gun, I could have had a hatchet, I was coming out of the room like an asshole. He admits he was being confrontational. Officer Gigante has suddenly found himself in a physical struggle with Nathan Belton, even though he was there to discuss the domestic violence report with Dana Deherjee. He's in this physical confrontation with Nathan Belton. Belton grabs him. There's some movement. Belton tries to drive Officer Deherjee against the plate glass window. Gigante moves around. Belton goes to the window, and there's a struggle. Officer Wayman comes in to assist. They're just about able to subdue Belton. Just as he's handcuffing, Dana Deherjee comes up from behind the wall and knocks Officer Gigante to the ground. That's undisputed. Their own expert says Dana Deherjee was acting illegally and not properly. The facts are also undisputed, that Officer Gigante was struck in the back of the head and that Dana Deherjee got on top of him and started beating him, beating him over and over and over again, and as the record shows, his hand was raw. It was cut from the beating. Belton broke free, and the two of them got on top of Officer Gigante, beating, beating, beating. There's no evidence that Officer Gigante wasn't knocked down. There's no evidence that Officer Gigante ever had the upper hand. This isn't a fistfight. We're up here and sparring like we're in a gym. Gigante was on the ground after being hit in the back of the head, after being winded from this confrontation with Belton, and then he's being beaten to the point where he thinks he's losing consciousness. I submit that under Graham v. Conner, the first prong of the test that Saussure enunciated, but it actually was confirming prior law, that the objectively reasonable thing for that officer to do is not to allow himself to be rendered unconscious. Don't do that. You can't retain your gun, and you can't defend yourself. When Officer Gigante testified, he thought he was being beaten to the point of no return. He's on the losing end. This is exactly like the Billington v. Smith situation, where he's on the losing end of it. Now, Ron Goodeagle's testimony is a minor factual dispute. He never says, Oh, the officer wasn't really in trouble. They were just kind of mixing it up and wrestling around, and all of a sudden the officer shot him for no reason. Goodeagle never said that. He said two years later, after the fact, he believed that the officer was standing up. And that's easy to account for because of the passage of time. The officer did stand up. Well, we can't account for it in that way. We have to assume that it's true. So we would have to assume that he somehow extricated himself at least enough to get into a standing position. Well, again, that would negate the physical evidence where Officer Gigante described himself being back against the wall. This is summary judgment, though. We can't assume the fact's in your favor. That's correct. Then even looking at that, the next step is, okay, would deadly force have been justified if Officer Gigante was on the ground? So if he's standing up and being beaten to the point of losing consciousness, that would not be justified. It's only justified if he's on the ground. And there's certainly no case law about that. What if, for instance, if he was standing up? In that case, presumably he would have had to get out of the confrontation at least enough to get to his feet. Now, that doesn't mean that the things that happened didn't happen, but what does it suggest about whether he had any alternative actions at his disposal? First of all, the record shows that that's not what Good Eagle testifies to. He never said the officer somehow was able to break free and somehow just had the strength to stand up. He never said that. He was standing, so there's however you want to describe it. He got from lying down to standing. Does that suggest anything about whether he had other options besides shooting? I believe not, Your Honor, and the reason is it's undisputed that the officer believed he was being knocked unconscious, and at that point you can't retain your gun and you can't defend yourself. He could have been beaten to death if he was rendered unconscious. Again, whether or not the use of deadly force is justified doesn't hinge on whether he's standing up or lying down. For instance, what if Dana had come up behind him and put him in a carotid restraint, a choke hold, and the officer felt himself going unconscious from the choke hold? He's standing up. He's not on the ground. But he's still on the losing end of a man who doesn't have a gun on him, who doesn't have a knife on him. He's technically unarmed except for applying the carotid restraint. Submitted in that circumstance, it would still be objectively reasonable for an officer to use deadly force. There's no law that requires an officer to be 100% certain that great bodily injury or death will come. There has to be probable cause under Tennessee v. Gardner. If you're dealing with a drunk, belligerent suspect who's already knocked you down, who's already beaten you, and you're at the losing end, and you're about to lose consciousness, and you know when you're out, you can't keep that gun at your side. That's probable cause, and I would submit that that is under the objective reasonableness standard. No warning was given, is that right? Before the shot was fired, Your Honor? Yeah. No. No, there's none on the record. I would further submit that if this court does find that Officer Gigante did violate Daniel Hergé's constitutional rights and those of the appellants by the use of deadly force, that we still look at the second prong of the Saussure test of what a reasonable officer would do. Again, I would submit to you that a reasonable officer, faced with a circumstance where he's losing, he's always been losing, and he's about to be rendered unconscious, a reasonable officer would not let himself be rendered unconscious and would use deadly force under those circumstances. With respect to the Hopkins v. Andaya case, that appellant's site, again, I believe it is distinguishable. We discussed it in detail in a brief. There were the two uses of force there. The court didn't dispute that the first use of deadly force was proper. It hinged on the second. And during the second use of deadly force, the decedent was unarmed and already wounded, and there was no threat at that time that was objectively reasonable. Here the threat was actual and ongoing. Daniel Hergé and actually Nathan Belton at that time were beating Officer Gigante to the point where he was losing consciousness. And again, there's no dispute about that. The appellees would submit that the district court did that, that under the law, the objective reasonable test of Graham v. Conner v. Smith. Here we have an officer who probably wasn't 100% certain that Daniel Hergé would take his gun, but no reasonable officer would bet his life that he wouldn't do that. Just as in Billington v. Smith or many, many other cases, this court has decided where the suspect is reaching for the officer's gun. Well, does the officer have to be certain that the guy won't just take out the gun and throw it away so they can continue to mix it up hand-in-hand? No. It's reasonable to assume that when you're engaged in a situation like that and someone reaches for your gun, that they're going to use it against you. Likewise, it's fair to assume that when someone attacks a uniformed armed police officer and beats him over and over again, there's no evidence that Dana ran across with your gun, they knocked him down, and then took the belt and ran away. They stayed and engaged him. There's no evidence that they were trying to flee, that it was going to let up, or that it was slowing at all. It's reasonable to assume, a reasonable officer would assume that there was a significant chance of great bodily injury. Under the Qualified Immunity Standard, we're also entitled to look at California law as to what a reasonable officer would base his decision on. Again, California law is in accord with federal law that an officer doesn't have to be 100% sure that death or great bodily injury will result. The threat can be reasonably apparent. It doesn't even have to be actual. So unless the Court has any further questions, I'd move further. Not on that, but I do have a question on the attorney's fees. If the summary judgment on the merits were affirmed, I have some difficulty understanding how the district court's order can stand up, in that it has absolutely no reasons given. There's no basis for appellate review of the award. And with respect to the amount, none explaining how the calculation was arrived at, the flying the lodestar, et cetera. So do you have any basis for defending it if you were to win on the merits? So are you only asking about the attorney fee portion and not the $9,800 in costs that were awarded? Yeah, I am. Just the attorney's fees portion. Certainly, Your Honor. The appellees were awarded approximately 20% of the attorney's fees that were asked for. In this case, we have the City of Hemet, Officer Gigante, Officer Wayman, and Detective Max Beams, a drifter, three individual defendants. There was also a cause of action for conspiracy. When we filed our motion for summary judgment, prior to that, in obtaining discovery, in obtaining Mr. Van Blaerkamp's expert report and in taking his deposition, I asked him, what did Officer Gigante do wrong? What did Officer Wayman do wrong? What did Detective Beams, a drifter, do wrong? And he testified, and the record shows Beams, a drifter, did nothing wrong. Just because of the track, it sounds like you're going down. My concern doesn't have to do with the 20% as such or whatever, so much as it does the entitlement to begin with, because the district court gave no reasons, and it's just essentially impossible to engage in any meaningful appellate review of an unreasoned decision, because even though it's discretionary, you have to find that the suit was groundless, frivolous, whatever the standard is. And he explained none of it, nor did the district judge go through the lodestar kind of calculus to get there. I mean, obviously, he did some math. Right. But I'm not concerned about his math. I'm concerned about how he even got to that point. I understand, Your Honor. In our motion for attorney's fees, of course, we asked for the whole amount. We said in the alternative, because this aspect of the case against Detective Beams, a drifter, was clearly frivolous, their own expert said he did nothing wrong. Because the aspect of the case dealing with conspiracy was frivolous, there's no opposition to it in the summary judgment. We should at least be entitled to recover our fees for the portion of the case that the city had to spend money to defend, where their own expert said it did nothing wrong. I think the question is that even assuming that there are, in fact, good reasons for what the district court did, can we make those up on behalf of the district court if the court didn't say them itself? I understand, Your Honor. I agree with you that the court didn't explicitly state the reason. However, because our motion for attorney's fees asked in the alternative for partial fees for this one portion of the case that was unopposed, we would ask for an apportionment based on one of the four defendants was named for no reason. One of the causes of action was there for no reason. So I would assume the court took our alternative grounds for relief into account when he gave us partial attorney's fees. And again, it was a 20 percent amount, not a 50 percent amount. It just represented a small portion of the case, which we nonetheless had to defend. Okay. Thank you. Thank you. Mr. Roth. Thank you, Your Honor. I would like to address the medical report just very briefly. The medical report contains two parts of evidence that are very important in this case. One is the statements that Mr. Gigande gave the day after the shooting as opposed to the statements that were given in February in the declaration. The statement to Dr. Reeves contained nothing about any injury or any physical attack after being struck by the suspect from behind. If we look at the record, that's all he told the doctor. He said he was struck by the suspect from behind and that he then turned and shot his and then he came in with physical complaints. The other aspect, the other aspect, by the way, that statement is on all fours with Mr. Goodeagle's description of what he saw. He was struck from behind. Within a couple of seconds standing, he shot. So I think that's an important issue with respect to disputed facts. But another source of strong circumstantial evidence is the discrepancy between the physical injuries that Dr. Reeves was able to observe the day after this meeting and what is described by Officer Gigande. Gigande and Wayman talk about Gigande being down on the ground and being struck repeatedly 10, 12 times and then again by Deherdige and by Belton, the face and head. The only injuries that Dr. Reeves saw the day after the beating was a tenderness to the occipit, the back of the head, a tenderness to the base of the neck, an abrasion to the right side of the neck where he would have been struck by Deherdige, abrasions and lacerations on the hands, and a swollen upper lip. Those are the only injuries. The swollen upper lip, by the way. Where does the mild concussion come in? The mild concussion is part of the diagnosis that Dr. Reeves gave on that. But there was no objective findings as to why there was a mild concussion. In other words, when Gigande talked to Reeves the day after the incident, Gigande told Dr. Reeves that he began to lose consciousness and then shot. And I think from the tenderness of the back of the head and from that, a doctor could reasonably conclude that there was a mild concussion. It's interesting that the same doctor filled out the form for off work for three days and didn't indicate anywhere there that there was any concussion. But he did in the written report indicate a mild concussion. I think what's interesting, though, is that the only injury other than where he would have been hit that one time by Deherdige, the only injury to the head is the swollen upper lip. And Gigande in his own declaration admitted that when he was struggling with Belton, after Belton went through the window, Belton swung and punched Gigande in the face with a fist, which is consistent with the swollen lip. All of this other attack that the officer says brought him in and out of consciousness, there's no physical evidence to support that. The physical evidence, in fact, is inconsistent with that and was not mentioned by the police officer in his statement, not mentioned by him at all in his statement to Dr. Reeves. He didn't say I went unconscious temporarily, I woke up, I was down on the ground, I was struck out. That's the same kind of factual disparity that the Court in Hopkins v. Zendaya felt was sufficient to bring into question the officer's version of the need for deadly force. And I think that's sufficient. We don't have to go beyond that analysis to decide this case. Okay. Thank you, Mr. Roth. Thank you, Your Honor. Counsel, I appreciate your argument. The matter just argued will be submitted.
judges: B. Fletcher, Rymer, Graber